UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                            :
In re:                                                      :
                                                            :
JVJ PHARMACY INC., *doing business as*                      :
UNIVERSITY CHEMISTS,                                        :                20 Civ. 7009 (JPC)
                                                            :
                        Debtor.                             :            OPINION AND ORDER
                                                            :
------------------------------------------------------------------X
                                                            :
HARRAH'S ATLANTIC CITY OPERATING                            :
COMPANY, LLC, *also known as* HARRAH'S RESORT               :
ATLANTIC CITY,                                              :
                                                            :
                        Appellant,                          :
                                                            :
            -v-                                             :
                                                            :
SALVATORE LAMONICA, AS CHAPTER 7                            :
TRUSTEE OF THE ESTATE OF JVJ PHARMACY                       :
INC., *doing business as* UNIVERSITY CHEMISTS,              :
                                                            :
                        Appellee.                           :
                                                            :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        JVJ Pharmacy Inc. (the "Debtor") operated a specialty pharmacy in Manhattan.  After the

Debtor petitioned for bankruptcy in 2016, Salvatore LaMonica, the appointed Chapter 7 trustee

for the Debtor's estate (the "Trustee"), filed an adversary proceeding against Harrah's Atlantic

City Operating Company, LLC, also known as Harrah's Resort Atlantic City ("Harrah's").  The

Trustee sought recovery of numerous transfers of funds (the "Transfers") initiated by James F.

Zambri, the Debtor's principal, through cash advances at an Atlantic City casino owned by

Harrah's (the "Casino").  After Zambri initiated these cash advances at a Casino ATM using the

Debtor's corporate debit card, non-party Global Cash Access Inc. ("Global Payments") authorized

the advances pursuant to its contract with Harrah's.  A Casino employee then handed cash to

Zambri, and the next federal wire day, Global Payments reimbursed Harrah's for that money. The Debtor's financial institution at some point transferred the same amount of money to Global Payments, plus applicable fees.

Harrah's appeals an August 6, 2020 Judgment of the United States Bankruptcy Court for the Southern District of New York (Bernstein, J.), which granted summary judgment in favor of the Trustee on his claim of constructive fraudulent transfer in violation of 11 U.S.C. § 548(a)(1)(B) and awarded a total judgment in the amount of $923,582.94. At the core of this appeal is whether the Bankruptcy Court erroneously found Harrah's to be the "initial transferee" of the Debtor's funds. The Bankruptcy Code allows a trustee to avoid and, in certain circumstances, recover fraudulent transfers made by a debtor, thereby returning the transferred funds to the bankruptcy estate for the benefit of creditors. The standard to determine whether a trustee may recover such funds depends, in part, on whether a recipient of the funds was the "initial transferee," the entity for whose benefit the transfers were made, a subsequent transferee, or a mere conduit of the funds. The Bankruptcy Court found that Global Payments was operating as Harrah's agent for purposes of the Transfers, thereby rendering Harrah's the initial transferee.

This Court concludes, however, that there are triable issues of fact as to whether an agency relationship existed, including with respect to whether Harrah's exercised sufficient control over Global Payments during this process. Similarly, without the agency holding, material issues of fact remain as to the transferee status of Harrah's and Global Payments, including whether Global Payments was a mere conduit of the funds. Accordingly, and for reasons discussed below, the Bankruptcy Court's August 6, 2020 Judgment in favor of the Trustee is vacated, and the case is remanded for further proceedings consistent with this Opinion and Order.

## I.  Background

Unless stated otherwise, the facts set forth below are not in dispute and are taken from the Joint Statement of Undisputed Facts in Support of Cross-Motions for Summary Judgment, filed in the Bankruptcy Court.  Adv. Proc. Dkt. 48; AA0001-AA0018 ("Joint Statement").[1]

### A.  The Underlying Bankruptcy and Adversary Proceeding

The Debtor was a specialty pharmacy located in Manhattan and, at all times relevant to this appeal, Zambri was the Debtor's principal and president.  Joint Statement ¶¶ 1, 3.  On March 3, 2016, the Debtor petitioned for Chapter 11 bankruptcy.  *In re JVJ Pharmacy Inc.*, No. 16-10508 (SMB, DSJ) (Bankr. S.D.N.Y.), Dkt. 1.[2]  On December 21, 2017, the Bankruptcy Court converted the case from Chapter 11 to Chapter 7 and appointed Salvatore LaMonica as the Trustee of the Debtor's estate.  *Id.*, Dkts. 222, 223.  On December 19, 2018, the Trustee commenced the adversary proceeding against Harrah's that has given rise to this appeal.  *LaMonica v. Harrah's Atl. City Operating Co.*, No. 18-01853 (SMB, DSJ) (Bankr. S.D.N.Y.).  After the Bankruptcy Court dismissed several claims in the initial Complaint without prejudice, *id.*, Adv. Proc. Dkt. 24; AA1281-AA1282, the Trustee filed an Amended Complaint against Harrah's on June 7, 2019, Adv. Proc. Dkt. 25; AA1283-AA1295 ("Amended Complaint").  The Amended Complaint alleged that Zambri, the Debtor's sole principal, caused the Transfers, totaling $859,040, to be made to Harrah's from the Debtor's bank account.  Amended Complaint ¶¶ 14-15, 18.  The Amended Complaint pleaded one claim of fraudulent conveyance in violation of 11 U.S.C. § 548(a)(1)(A),

---

[1] Citations to "Dkt." refer to the docket of the instant appeal.  Citations to "Adv. Proc. Dkt." refer to the docket of the adversary proceeding, *LaMonica v. Harrah's Atl. City Operating Co.*, No. 18-01853 (SMB, DSJ) (Bankr. S.D.N.Y.).  Citations to the appendix filed on appeal are marked as "AA."

[2] On March 1, 2021, following the retirement of the Honorable Stuart M. Bernstein, the adversary proceeding and the underlying bankruptcy were reassigned to the Honorable David S. Jones.  *See In re JVJ Pharmacy Inc.*, No. 16-10508 (SMB, DSJ) (Bankr. S.D.N.Y.), Dkt. 307; Adv. Proc. Dkt. 86.

one claim of constructive fraudulent transfer in violation of section 548(a)(1)(B), four claims of fraudulent conveyance under New York law, and one claim of unjust enrichment. *Id.* ¶¶ 42-100.

## B.  The Cash Advance Process at the Casino

From January 2, 2015 to August 3, 2015, Zambri frequented the Casino and, using the Debtor's corporate debit card, initiated numerous cash advances from the Debtor's operating account at JP Morgan Chase Bank, N.A. (the "Chase Account").  Joint Statement ¶¶ 5, 8, 9 (p. 14), 70.[3]  During this time, and while the Debtor was insolvent, Zambri caused the withdrawal of $859,040, *i.e.*, the Transfers, from the Chase Account through such cash advances. *Id.* ¶¶ 71, 93-94.  Because Harrah's liability under the Bankruptcy Code turns, at least in part, on whether Harrah's functioned as the initial transferee or as a subsequent transferee of the Debtor's funds, which is a determination that may be impacted by whether Global Payments was Harrah's agent and whether Global Payments functioned as a mere conduit for the funds, the Court reviews the process by which Zambri received cash advances at the Casino and by which the Debtor's funds left the Chase Account, including the relationships amongst the entities involved in that process.

At the relevant time, a third-party named Ultron Processing Services, Inc. ("Ultron") entered into a master service agreement with Harrah's to provide ATM services at the Casino. *Id.* ¶¶ 8 (p. 4), 17; AA0049-AA0213 ("Ultron MSA").[4]  "ATM Services" under the Ultron MSA included various functions that one would expect from an ATM, such as cash withdrawals and

___

[3] There are a couple of typographical errors in the Joint Statement with certain paragraphs marked the same number.  When citing to a paragraph number that repeats in the Joint Statement, the Court adds the page number for clarification.

[4] Caesars Entertainment Operating Company, Inc. ("Caesars") entered into the relevant contracts related to Ultron's ATM services.  Harrah's is an affiliate of Caesars, Joint Statement ¶¶ 18, 25, and, as noted by the Bankruptcy Court, the parties refer to Caesars and Harrah's interchangeably, *see* Adv. Proc. Dkt. 71; AA1038-AA1063 ("July 24, 2020 Order") at 4 n.4.  The parties do not argue that this has any legal or factual significance to the dispute.  Accordingly, for clarity purposes, the Court refers to Caesars as "Harrah's" when citing the relevant contracts.

balance inquiries, as well as "gateway access for Optional Transactions and other services and duties," including cash advances.  Joint Statement ¶¶ 20-22, 27; AA0065.  Under the Ultron MSA, "Authorization for Optional Transactions" initiated on these ATMs was to be "provided by Global Payments" with cash advance transactions initiated at the ATMs to "be fulfilled at [the Harrah's] cashier cage."  *Id.* ¶¶ 23-24; AA0069.  Harrah's contracted with Global Payments to authorize such cash advances and to process the transfers with the relevant financial institutions.  *Id.* ¶ 30; AA0214-AA0394 ("Global Payments MSA").  The Global Payments MSA provided that Harrah's engaged with Global Payments

> to act as its agent for the sole purpose of providing a quasi-cash advance services [sic], whereby the authorized holders . . . of a valid credit or ATM/debit card . . . may obtain quasi-cash advances (individually, a "Cash Advance") in exchange for a service charge, subject in each case to (i) the Cardholder's available credit limit and/or account balance, (ii) receipt of proper authorization for the Cash Advance transaction from the Card issuer, and (iii) compliance by [Harrah's] with security policies and procedures . . . and [Global Payments] and [Harrah's] desire to enter into this Agreement, whereby [Global Payments] will supply Cash Advances at the Locations listed on Schedule A for Cardholders who will ultimately purchase gaming chips.

*Id.* ¶ 33; Global Payments MSA, Exh. B, Services, Equipment and Software ¶ 1; AA0226.  The Casino was added to Schedule A of this agreement, making it a location where Global Payments would provide cash advance services.  Joint Statement ¶ 41; AA0263-AA0267.

Although certain language from the Global Payments MSA quoted above could be read to suggest that Global Payments itself would supply cash to the cardholder at the Casino, the evidence in the record reveals that cash advances proceeded as follows.  After a cardholder initiated the transaction at a Casino ATM, Global Payments was responsible for obtaining approval from a pertinent cardholder association or from the card issuer, which in the Debtor's case was Chase.  Joint Statement ¶¶ 5, 48, 63.  If approved, the cardholder received from the ATM a receipt that read "PlayerCash @dvantage," a term Global Payments used to identify cash advance receipts.  *Id.* ¶ 55.  These paper receipts also included a header with the notation "Harrah's Atlantic City," along

with Harrah's address, phone number, and merchant number.  *Id.* ¶ 57.  The receipt further directed the cardholder to bring it to a cashier cage in the Casino, where the cardholder also was required to show the cashier the card used to initiate the transaction and photo identification.  *Id.* ¶¶ 48, 52. After verifying that the cardholder's identity matched the name on the card, the cashier confirmed that Global Payments' separate and independent processing system authorized the transaction.  *Id.* ¶¶ 53-54, 62.  If Global Payments' system authorized the transaction, the Harrah's cashier provided funds to the cardholder.  *Id.* ¶ 64.  The actual money that the Casino's employee handed to a cardholder, such as Zambri, thus came from Harrah's funds.  *Id.* ¶¶ 50-51.

Global Payments, in turn, reimbursed Harrah's for the amount of the cash advance the next federal wire day in a bulk settlement consisting of all cash advances from the prior day.  *Id.* ¶ 66. Similarly, the financial institution that issued the card used at the Casino ATM reimbursed Global Payments for the funds advanced by Harrah's, plus fees.  *Id.* ¶ 65.  Global Payments charged a 4% cash advance fee for these transactions, with Global Payments retaining 25% of that fee and then transferring the remaining 75%, less any network organization fees, to Harrah's at the end of the month.  *Id.* ¶¶ 42-46, 67.

From January 2, 2015 to August 3, 2015, Zambri caused the Transfers to be withdrawn from the Debtor's Chase Account, as a result of the cash advance process described above.  *Id.* ¶¶ 70-72, 74.  In other words, on multiple occasions, Zambri initiated a cash advance using the Debtor's debit card at an Ultron ATM at the Casino, Global Payments authorized and processed the transaction after obtaining approval from Chase, Zambri received a printed receipt from the ATM which he then provided along with identification verification at the cashier cage, and a Casino employee disbursed cash from the Harrah's cashier's drawer to Zambri after accessing Global Payments' independent processing system to confirm authorization of the transaction.  *Id.* ¶¶ 77-79.  The parties agree that Global Payments and Harrah's then followed their usual process

after the cash was handed to Zambri at the Casino:  The following federal wire day, Global Payments reimbursed Harrah's for the cash advanced to Zambri via a bulk settlement that included any other advances, and Global Payments was, at some point, paid by Chase from the Debtor's Chase Account for the amount of the Transfers, plus the 4% fee.  *See* Joint Statement ¶¶ 65-66, 77; *see also* Dkt. 12 ("Harrah's Brief") at 23; Dkt. 16 ("Trustee's Brief") at 24.[5]  A legal collection analyst who provided collection services for Harrah's submitted a sworn declaration stating that, during the relevant period, no money was paid directly to Harrah's by the Debtor, Joint Statement ¶ 85; AA1149, and there is no evidence to the contrary.

**C.  The Bankruptcy Court's July 24, 2020 Order**

Both the Trustee and Harrah's moved for summary judgment before the Bankruptcy Court. Adv. Proc. Dkts. 56-59, 61-69; AA0868-AA1006.  In its motion, the Trustee argued that: (1) the Transfers were paid to Harrah's through its agent, Global Payments, rendering Harrah's the initial transferee; (2) Harrah's did not provide the Debtor with value in exchange for the Transfers as it was Zambri, the principal of the Debtor and not the Debtor itself, who received the benefit of the cash advances;[6] and (3) the Debtor was insolvent at the time of the Transfers, as required for a constructive fraudulent conveyance claim.  *See* AA0925-AA0934.  Harrah's, in its motion, argued that the constructive fraudulent transfer claim should be dismissed because (1) Harrah's was not a transferee of the Debtor's funds and (2) if Harrah's were found to be a transferee, it was at most a

---

[5] While no evidence was submitted confirming that Global Payments was paid by Chase, nor showing Harrah's receipt of the bulk settlements in connection with the Transfers, the parties rely on the contractual relationship between Harrah's and Global Payments to assume that these reimbursements occurred.  *See* Dkt. 23 ("6/9/21 Tr.") at 17, 28-29.

[6] As discussed below, an element for avoiding a transfer is that a debtor did not receive reasonably equivalent value in return for the allegedly fraudulent transfer.  *See* 11 U.S.C. § 548(a)(1)(B)(i).  In addition, section 548(c) permits an initial transferee to retain a fraudulent transfer if it took the transfer "for value and in good faith" and "gave value to the debtor in exchange for such transfer or obligation."  11 U.S.C. § 548(c).

subsequent transferee with a good faith defense to liability. *See* AA0882-AA0890.  While not at issue on appeal, Harrah's also argued that the Trustee's New York fraudulent transfer claims should be dismissed because New Jersey law applied to these claims, and that there was no evidence of fraudulent intent to support an actual fraudulent transfer claim under section 548(a)(1)(A). *See* AA0878-AA0882; AA0891-AA0892.

On July 24, 2020, the Bankruptcy Court granted both motions for summary judgment in part.  The Bankruptcy Court dismissed the Trustee's New York fraudulent conveyance claims upon concluding that New Jersey fraudulent transfer law governed.  July 24, 2020 Order at 17. The Bankruptcy Court also dismissed the Trustee's federal intentional fraudulent transfer claim after finding that the Trustee abandoned the claim by failing to respond to Harrah's arguments for its dismissal. *Id.* at 18-19.

At issue on appeal is the Bankruptcy Court's grant of summary judgment in favor of the Trustee on his constructive fraudulent transfer claim under section 548(a)(1)(B).  After finding that the existence of the withdrawals and the Debtor's insolvency were not in dispute, *id.* at 19, the Bankruptcy Court turned to "[t]he principal issue that divides the parties," *id.* at 20, *i.e.*, whether Harrah's or Global Payments was the initial transferee.

The court noted that the parties' agreement that "Global [Payments] received the Transfers from the Chase Account" does not end this inquiry, as "the first recipient of the funds is not necessarily the 'initial transferee' of the funds." *Id.* at 20 (citing *Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey) ("Finley")*, 130 F.3d 52, 56-57 (2d Cir. 1997)).  The Bankruptcy Court elaborated that "where the recipient—the first entity to touch the transferred property—is contractually obligated to turn it over to a third-party, the recipient is a 'mere conduit' and the entity it pays the transfer to is the 'initial transferee.'" *Id.* (quoting *Finley*, 130 F.3d at 58).  The Bankruptcy Court then found that

8

Global Payments acted as Harrah's agent in connection with the Transfers, citing the absence of any Global Payments funds advanced to Zambri, Global Payments' inability to retain any money transferred from the Chase Account other than a processing fee, and its contractual obligation to pay Harrah's any cash that Harrah's had advanced. *Id.* at 21. The court therefore found Harrah's to be the initial transferee of the Transfers, with the exception of the 1% processing fee that Global Payments retained. *Id.* at 21-22.[7]

The Bankruptcy Court also found that the Trustee met his burden in demonstrating that the Debtor did not receive reasonably equivalent value in exchange for the Transfers as "[t]he undisputed facts show that the Debtor did not receive any value." *Id.* at 23. As the court explained, "Zambri received the value for his personal use [and] . . . . Harrah's does not suggest that Zambri used any of the cash advances to pay the Debtor's expenses or redeposited any portion in the Debtor's bank accounts." *Id.* at 23. "In short," held the Bankruptcy Court, "Zambri got the cash; the Debtor got none." *Id.* Finally, the Court noted that an initial transferee may raise an affirmative defense and "defeat the avoidance claim, in whole or in part, by demonstrating that it received the transfer in good faith and gave value to the *debtor*" under 11 U.S.C. § 548(c). *Id.* at 24. Because Harrah's did not give value to the Debtor, but rather to Zambri, the Bankruptcy Court found that defense inapplicable. *Id.*

---

[7] The Bankruptcy Court also commented that holding Harrah's to be the initial transferee "is consistent with the practical concerns" espoused in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988), where the Seventh Circuit discussed the differences in potential liability of initial and subsequent transferees. July 24, 2020 Order at 22. Analogizing to a scenario where an initial transferee of a fraudulent transfer buys a vehicle from a car dealer who had no reason to suspect malfeasance, the Seventh Circuit explained that "[t]he initial transferee is the best monitor [of any risk in the conveyance]; subsequent transferees [*e.g.*, the car dealer] usually do not know where the assets came from and would be ineffectual monitors if they did." *Bonded Fin. Servs.*, 838 F.2d at 892-93. The Bankruptcy Court reasoned that Global Payments "was in the best position to monitor the Transfers" and that "Harrah's bore the risk that the transfer of funds by the Debtor to Harrah's to allow Zambri to gamble or use as he saw fit might be fraudulent and had the ability to decide whether that risk was worth the reward." July 24, 2020 Order at 22-23.

Accordingly, the Bankruptcy Court found that the Trustee was entitled to $850,449.60, which is the full amount of the Transfers less the 1% fees retained by Global Payments for its services.  *Id.* at 24.  After calculating pre-judgment and costs, the Court entered a total judgment of $923,582.94 on August 6, 2020.  Adv. Proc. Dkt. 73; AA1071-AA1072.

## D.  The Instant Appeal

Harrah's filed a notice of appeal on August 11, 2020.  *See* Dkt. 1; Adv. Proc. Dkt. 75.  The case was reassigned to the undersigned on September 29, 2020.  On October 16, 2020, Harrah's filed its opening brief.  Harrah's Brief.  The Trustee filed his opposition brief on November 30, 2020, Trustee's Brief, and Harrah's filed a reply brief on December 21, 2020, Dkt. 17.[8]  The Court held oral argument on the appeal on June 9, 2021.  6/9/21 Tr.

## II.  Legal Standards

## A.  Standard of Review

This Court has appellate jurisdiction over appeals "from final judgments, orders, and decrees" of bankruptcy courts under 28 U.S.C. § 158(a)(1).  After reviewing a decision of a bankruptcy court, the district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  *Margulies v. Hough (In re Margulies)*, 566 B.R. 318, 328 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).  A district court reviews a bankruptcy court's factual findings for clear error and its conclusions of law *de novo*.  *See Pergament v. Brooklyn L. Sch.*, 595 B.R. 6, 9-10 (E.D.N.Y. 2019) (citing *$R^2$ Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 691 F.3d 476, 482-83 (2d Cir. 2012)).  Because on a summary judgment motion, a court must not weigh evidence but instead is tasked with deciding whether judgment is appropriate as a matter of law, this Court reviews a bankruptcy court's grant of summary judgment *de novo*.  *See, e.g.*, *Hanover Direct, Inc. v. Marx*

---

[8] The Trustee has not cross-appealed the Bankruptcy Court's dismissal of his other claims.

*Realty & Improvement Co. (In re T.R. Acquisition Corp.)*, 309 B.R. 830, 835 (S.D.N.Y. 2003).

The Bankruptcy Code incorporates Rule 56 of the Federal Rules of Civil Procedure into bankruptcy adversary proceedings through Rule 7056 of the Federal Rules of Bankruptcy Procedure.  *See* Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56.  When deciding a motion for summary judgment under Rule 56, "[t]he district court is not permitted to resolve issues of fact, but must determine (a) whether there is a 'genuine issue as to any material fact,' and (b) whether, in light of the undisputed facts, 'the movant is entitled to judgment as a matter of law.'"  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (quoting Fed. R. Civ. P. 56(c)(2) (amended in 2010)).  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A court must review the evidence in the light most favorable to the non-moving party, with all reasonable inferences drawn in that party's favor.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The nonmoving party, however, must still "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015) (quoting *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015)).  It may not rely on "conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), or on "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, in opposing the motion.

## B.  Constructive Fraudulent Transfer

A trustee may avoid certain transfers of a debtor's interest in property pursuant to 11 U.S.C. § 548.  "The purpose of this provision is to set aside transactions that 'unfairly or improperly deplete a debtor's assets' so that the assets may be made available to creditors."  *Geltzer v.*

11

*Xaverian High Sch. (In re Akanmu)*, 502 B.R. 124, 130 (Bankr. E.D.N.Y. 2013) (quoting *Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach Co.)*, 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010)).  Under section 548(a)(1)(B), a trustee may avoid a transfer under a theory of constructive fraud.  To do so, the trustee must demonstrate that: (1) the transfer was "of an interest of the debtor in property . . . or any obligation . . . incurred by the debtor," (2) "that was made or incurred on or within 2 years before the date of the filing of [the bankruptcy petition]," (3) the debtor "received less than a reasonably equivalent value in exchange for such a transfer or obligation," and (4) the debtor "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation."  11 U.S.C. § 548(a)(1), (a)(1)(B)(i)-(ii)(I); *accord BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 535 (1994).[9]

Once a trustee satisfies these elements, 11 U.S.C. § 550 governs the available remedies by laying out a mechanism for a trustee to recover a transfer that has been avoided.  *See Bruno Mach. Corp. v. Troy Die Cutting Co., LLC (In re Bruno Mach. Corp.) ("Bruno Mach. Corp.")*, 435 B.R. 819, 847 (Bankr. N.D.N.Y. 2010) ("[I]n addition to establishing the avoidability of the transfers . . . , [a trustee] must also establish a means of recovery under § 550(a), and 'identify a specific category of persons from whom recovery of the fraudulent transfer[s] may be had.'" (third alteration in original) (quoting *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999)).  In other words, "[s]ection 550(a) works in tandem with" section 548(a) "by enabling a trustee to recover fraudulently transferred property.  Recovery is the business end of avoidance.  In that sense, § 550(a) 'is a utility provision, helping execute the policy of § 548' by 'tracing the fraudulent transfer to its ultimate resting place (the initial or subsequent transferee).'"  *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC ("Picard")*,

---

[9] Section 548(a)(1)(B) provides three other avenues for establishing a constructive fraud claim, *see* 11 U.S.C. § 548(a)(1)(B)(ii)(II)-(IV), which are not at issue in this appeal.

12

917 F.3d 85, 98 (2d Cir. 2019) (citing Edward R. Morrison, *Extraterritorial Avoidance Actions:*

*Lessons from Madoff*, 9 Brook. J. Corp. Fin. & Com. L. 268, 273 (2014)).

Section 550 provides that recovery may occur "for the benefit of the estate" from the

"initial transferee of such transfer," "the entity for whose benefit such transfer was made," or "any

immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(1)-(2). The

difference between the first two categories and an "immediate or mediate transferee of such initial

transferee," *i.e.,* a subsequent transferee, has legal significance. A subsequent transferee can raise

an affirmative defense to liability by demonstrating that it took the transfer "for value . . . in good

faith, and without knowledge of the voidability of the transfer avoided." *Id.* § 550(b)(1).

Meanwhile, the initial transferee or the entity for whose benefit the transfer was made is limited to

the defense contained in section 548(c), which is similar to the defense available to a subsequent

transferee in section 550(b)(1), but for one important difference. Under section 548(c), an initial

transferee or entity for whose benefit the transfer was made may retain the transfer if it took the

transfer "for value and in good faith" and "gave value *to the debtor* in exchange for such transfer

or obligation." *Id.* § 548(c) (emphasis added). Thus, while a subsequent transferee may invoke a

defense to recovery by proving that it took the transfer "for value" from the previous transferor, in

addition to acting in good faith and without knowledge of the transfer's avoidability, the initial

transferee or the entity for whose benefit the transfer was made must further show that it "gave

value" *to the debtor*.

### III. Discussion

Harrah's challenges the Bankruptcy Court's grant of summary judgment to the Trustee on

his constructive fraudulent transfer claim and denial of its cross-motion for summary judgment on

that same count. Harrah's Brief at 1. Harrah's argues that the Bankruptcy Court erred by (1)

concluding that Global Payments acted as Harrah's agent for purposes of facilitating the cash

13

advances, *id.* at 13-21, (2) relying on that agency determination to find that Harrah's was an initial transferee despite the existence of genuine issues of material fact, *id.* at 21-35, and (3) holding that the Trustee met its burden in demonstrating that the Debtor did not receive reasonably equivalent value for the transfers, a requirement for avoidance of a transfer under section 548(a)(1)(B)(i), *id.* at 35-36.

For reasons mentioned below, this Court finds that the Bankruptcy Court correctly held that the Debtor did not receive reasonably equivalent value for the transfers for purposes of section 548(a)(1)(B)(i), as no material factual dispute exists on this issue.  The Transfers thus were properly avoided under the Bankruptcy Code.  This Court, however, finds that the Bankruptcy Court erred in concluding on summary judgment that Global Payments acted as Harrah's agent in connection with the Transfers, because the language of the Global Payments MSA is not dispositive on the agency issue and disputed issues of fact remain as to whether Harrah's exercised sufficient control over Global Payments.  The Court further concludes that because Harrah's transferee status may turn on a fact-finder's determination of any agency relationship between Harrah's and Global Payments, the transferee determination—and any other issues that may remain—should be addressed by the Bankruptcy Court in the first instance.

**A.  The Debtor Failed to Receive Reasonably Equivalent Value for the Transfers**

Because the Transfers must be avoided under section 548(a)(1) before the Trustee can invoke section 550 to seek recovery, *see Picard*, 917 F.3d at 98, the Court begins with the Bankruptcy Court's holding that the Debtor did not receive reasonably equivalent value for the Transfers.

This Court agrees that the Trustee made a sufficient showing that the Debtor "received less than a reasonably equivalent value in exchange for [the] transfer or obligation."  11 U.S.C. § 548(a)(1)(B)(i); *see Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*, 500

14

B.R. 371, 378 (Bankr. S.D.N.Y. 2013) (collecting cases for the proposition that a trustee bears the burden of proof on satisfying the elements of an avoidance claim under section 548(a)).  The record on appeal makes clear that Zambri, not the Debtor, received the value of the Transfers for his personal use.  *See* Joint Statement ¶ 90 (describing the complimentary benefits received by Zambri for his visits to the Casino, including free stays, meals, and entertainment), Exh. 7 (cash advance receipts reflecting Zambri as the recipient of the cash), Exh. 10 (Harrah's Title 31 Multiple Transaction Log identifying Zambri as a patron of the Casino).  Harrah's has failed to come forward with any evidence to suggest otherwise.

Instead, Harrah's insists that it was possible that Zambri "used the funds to pay the Debtor's debts, support the business of the Debtor, entertain [the] Debtor's vendors and/or creditors, or even gamble intending to potentially win more money to pay of [sic] [the] Debtor's debts."  Harrah's Brief at 36.  Even after drawing all reasonable inferences in Harrah's favor, there is no factual support for an inference that Zambri used the funds from the cash advances for the Debtor's benefit.  To the contrary, it defies logic that a specialty pharmacy in Manhattan would have benefited from its principal withdrawing and gambling of the pharmacy's funds in Atlantic City, let alone benefit by an amount reasonably equivalent to the value of the Transfers.  The unfounded speculation on the part of Harrah's that it is possible that some portion of the cash advances (or Zambri's gambling winnings) was used to pay the Debtor's debts or support its business falls well short.  *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . .  [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." (alterations in original) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995))).

The Trustee therefore has demonstrated that no genuine issue of material fact exists as to

this element under section 548(a)(1), and the Transfers were properly avoided under the Bankruptcy Code.

**B. Triable Issues of Fact Remain as to the Existence of an Agency Relationship Between Global Payments and Harrah's**

The Court next turns to Harrah's challenge to the Bankruptcy Court's holding that Global Payments acted as an agent of Harrah's for purposes of the Transfers.  Harrah's Brief at 13-21. Upon review of the evidence in the record, the Court vacates this holding and finds that there are triable issues of fact as to whether an agency relationship existed between Harrah's and Global Payments.

**1.  Choice of Law**

The Court must first decide which jurisdiction's agency law applies.  As noted above, the Bankruptcy Court held that New Jersey law applied to the Trustee's fraudulent transfer claims. *See* July 24, 2020 Order at 17.  On the issue of agency, however, both the Trustee and Harrah's cite to Second Circuit cases applying New York law.  Harrah's Brief at 14; Trustee's Brief at 18-20; *see Com. Union Ins. Co v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (citing Restatement (Second) of Agency and *Meese v. Miller*, 436 N.Y.S.2d 496, 499 (App. Div. 1981)); *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 702 (2d Cir. 1990) (discussing agency after finding that New York common law applied to the action).  The Trustee similarly cited to New York agency law before the Bankruptcy Court, without resistance from Harrah's.  *See* AA0927-AA0928.

While "such 'implied consent . . . is sufficient to establish choice of law,'" *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000) (alteration in original) (quoting *Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)), a choice of law analysis is unnecessary here because, as relevant to this appeal, there is no conflict between New York and New Jersey agency law.  A bankruptcy court generally "appl[ies]

the choice of law rules of the forum state." *Geron v. Seyfarth Shaw LLP (In re Thelen LLP)*, 736 F.3d 213, 219 (2d Cir. 2013). "In New York . . . the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). As confirmed by counsel for Harrah's at oral argument, *see* 6/9/21 Tr. at 20-21, under both New York and New Jersey law, control by the principal—which, for reasons discussed below, is the pertinent issue here—is a necessary element of an agency relationship. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012); *Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*, 431 F. Supp. 3d 518, 527 (D.N.J. 2019). The Court therefore applies New York agency law.

### 2.   Relevant New York Law Governing the Existence of an Agency Relationship

"New York common law provides that an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Bigio*, 675 F.3d at 175 (quoting *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001)). "An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control." *Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc. (In re Shulman Transp. Enters., Inc.) ("Shulman")*, 744 F.2d 293, 295 (2d Cir. 1984). For "an agency relationship . . .  purported to be established by contract, 'a court will look to the language of the agreement to ascertain the relationship created between the parties.'" *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 103 (S.D.N.Y. 2013) (citing *Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x, 572, 575 (2d Cir. 2010)). But the realities of the contractual relationship between the parties, not labels in the agreement, control. *See, e.g.*, *Supreme Showroom, Inc. v. Branded Apparel Grp. LLC*, No. 16 Civ. 5211 (PAE), 2018 WL 3148357, at *9-10 (S.D.N.Y. June 27, 2018); *Samba Enters., LLC v. iMesh Inc.*, No. 06 Civ. 7660 (DC), 2009 WL 705537, at *7-8 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom.*

390 F. App'x 55 (2d Cir. 2010); *see also* Restatement (Third) Of Agency § 1.02 (2006) cmt. a ("Although agency is a consensual relationship, how the parties to any given relationship label it is not dispositive.").

"The existence of an agency relationship is a mixed question of law and fact that should generally be decided by [the trier of fact at trial]." *Samba Enters., LLC*, 2009 WL 705537, at *7. Only if the "material facts from which [agency] is to be inferred are not in dispute, the question of agency is not open to doubt, and only one reasonable conclusion can be drawn from the facts in the case," may agency be decided by the court as a matter of law. *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 301 (S.D.N.Y. 2005) (alteration in original) (quoting *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 n.14 (2d Cir. 1994)).

### 3. The Terms of the Global Payments MSA Are Not Dispositive as to an Agency Relationship

Both parties rely heavily on provisions from the Global Payments MSA, the contract that governed the relationship between Global Payments and Harrah's for purposes of cash advance services at the Casino. Harrah's points to Paragraph 21.b of the Standard Terms and Conditions section, which provided that Global Payments was an independent contractor and that neither Harrah's nor Global Payments would represent itself to be an agent of the other, nor possess any authority to create an obligation for or bind the other party:

> Relationship of the Parties. [Global Payments] is an independent contractor. At no time will either Party represent itself as an agent, employee, lessee, sub-lessee, partner or joint venture partner of the other Party, and no employer-employee relationship shall exist between either Party and any employee or agent of the other Party. Neither party hereto shall have the express or implied right or authority to assume or create any obligation on behalf or in the name of the other Party or to bind the other Party in regard to any contract, agreement or undertaking with any third party.

Global Payments MSA, Exh. A, Standard Terms and Conditions ¶ 21.b; AA0224; *see* Harrah's Brief at 17-19.

The Trustee meanwhile relies on a different provision of the Global Payments MSA, contained in the Services, Equipment, and Software section.  This language provided that Harrah's engaged Global Payments as its agent for the "purpose of providing a quasi-cash advance" service:

> [Harrah's] engages [Global Payments] to act as its agent for the sole purpose of providing a quasi-cash advance services [sic], whereby the authorized holders . . . of a valid credit or ATM/debit card . . . may obtain quasi-cash advances (Individually, a "Cash Advance") in exchange for a service charge.

Global Payments MSA, Exh. B, Services, Equipment, and Software ¶ 1; AA0226; *see* Trustee's Brief at 8-9, 18, 20-21.

Maintaining that these two provisions stand in conflict, Harrah's argues that Paragraph 21.b of the Standard Terms and Conditions controls pursuant to a provision that is contained on the first page of the Global Payments MSA.  Under that provision, "[i]n the event of conflict between the Terms and Conditions and any exhibit . . . the Terms and Conditions shall control." Global Payments MSA, p. 1 ¶ 3; AA0215.  *See* Harrah's Brief at 18-19.  Thus, Harrah's argues, the prevailing language of the agreement, *i.e.*, Paragraph 21.b, disavowed any agency relationship between Harrah's and Global Payments.  Harrah's Brief at 19.  For reasons described below, however, the Court finds that the language of the Global Payments MSA is not dispositive on the issue of agency.

Notwithstanding the provision in the Services, Equipment, and Software section stating that Harrah's engaged Global Payments as an agent for purposes of providing cash advance services, "[t]alismanic language alone does not determine an agency relationship."  *In re Nigeria Charter Flights Cont. Litig.*, 520 F. Supp. 2d 447, 461 (E.D.N.Y. 2007) (alteration in original) (quoting *Pan Am. World Airways, Inc. v. Cont'l Bank (In re Shulman Transp. Enters., Inc.)*, 33 B.R. 383, 385 (S.D.N.Y. 1983)).  "That is because 'it is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.'"  *Supreme Showroom*, 2018 WL 3148357, at *9 (quoting

*EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20 (2005)); *see also Morgan Art Found. Ltd. v. Brannan*, No. 18 Civ. 8231 (AT) (BCM), 2020 WL 469982, at *20 (S.D.N.Y. Jan. 28, 2020); *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 454 (S.D.N.Y. 2015) (finding that the court "must look past the labels that [the parties] placed on their relationship, and instead plumb the real character of the services [provided] . . . because, '[u]ltimately, the dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature "finder" or "broker" or even "agent," but instead by the services agreed to under the contract between the parties.'" (quoting *Ne. Gen. Corp. v. Wellington Adver., Inc.*, 82 N.Y.2d 158, 163 (1993))).  Thus, even if only before the Court were the contract's language that Harrah's engaged Global Payments as its agent for cash advance services, that language alone would not answer the question of whether an agency relationship in fact existed.

While this well-settled principle also applies to provisions purporting to disclaim an agency relationship, some courts have given effect to agency disclaimers that are "express and unambiguous."  *See Supreme Showroom*, 2018 WL 3148357, at *9 (collecting cases).  Nevertheless, "where a writing erects the essential structure of an agency relationship," then "even an explicit disclaimer cannot undo it."  *Veleron Holding, B.V.*, 117 F. Supp. 3d at 452 (citing *EBC I, Inc.*, 5 N.Y.3d at 20).  Here, the provision at Paragraph 21.b was not a sufficiently "express and unambiguous" disclaimer of agency to be, by itself, determinative.

Particularly instructive is the analysis in *Supreme Showroom, Inc.*, where the Honorable Paul A. Engelmayer found that similar contractual language did not effectively disclaim an agency relationship.  2018 WL 3148357 at *9.  The contract in *Supreme Showroom* provided that "[the plaintiff] is an independent contractor and under no circumstances will [the plaintiff] . . . purport to legally bind [the defendant] in any matter, and/or hold himself out as an employee or agent with legal authority to bind [the defendant]."  *Id.*  In finding that this language did "not expressly

disclaim an agency relationship," *id.*, the court noted that "it is only colloquially that the terms independent contractor and agent are necessarily distinct," *id.* (quoting *CBS Inc. v. Stokeley-Van Camp, Inc.*, 522 F.2d 369, 375 n.14 (2d Cir. 1975)), and that "the power to bind a principal is not the *sine qua non* of an agency relationship," *id.* (citing Restatement (Third) of Agency § 1.01 (2006) cmt. c ("Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf.")). *See also Butto v. Collecto Inc.*, 845 F. Supp. 2d 491, 497 (E.D.N.Y. 2012) ("There is no doubt that an independent contractor may simultaneously be an agent." (citing *United States v. Thomas*, 377 F.3d 232, 238 (2d Cir. 2004) and Restatement (Second) of Agency § 14N (1958)). The court also highlighted the types of "express and unambiguous" agency disclaimers that courts in this District have found valid, all of which were more explicit than the language used in the Global Payments MSA. *Supreme Showroom, Inc.*, 2018 WL 3148357, at *9 (collecting cases); *see also Samba Enters., LLC.*, 2009 WL 705537, at *2, 7-9 (finding that a contract's language that it was "not intended to create a[n] [agency relationship]" and that "[n]either party may act in a manner which expresses or implies a relationship other than that of independent contractor, nor bind the other party," was not dispositive on whether the parties intended to create an agency relationship).

The same reasoning applies here. The language in Paragraph 21.b of the Standard Terms and Conditions section of the Global Payments MSA did not expressly provide that no agency relationship existed between Harrah's and Global Payments. It merely named Global Payments as an independent contractor, prohibited the parties from representing to others that an agency relationship existed, and prohibited the parties from binding each other to obligations through any implied or express authority. The Court must therefore look past this language—and the language in the Services, Equipment, and Software section—to determine the actual character of the relationship between Global Payments and Harrah's.

21

### 4. Genuine Issues of Material Fact Exist as to Whether Global Payments Acted as Harrah's Agent

The next question on the agency issue is therefore whether the relationship established by the structure of the Global Payments MSA and the respective responsibilities of Harrah's and Global Payments gave rise to an agency relationship for purposes of the Transfers. This Court concludes that the record presented could lead a reasonable trier of fact to find that Global Payments did not act as Harrah's agent.

When a party contends that an agency relationship arose by contract, "[a] principal's ability to exercise control over its agent is an essential element of agency." *Steinbeck*, 400 F. App'x at 575; *see also Com. Union Ins. Co.*, 347 F.3d at 462 ("[T]he principal must maintain control over key aspects of the undertaking."). When, as here, a contract for services is at issue, courts look to the purported principal's authority to give interim instructions to distinguish ordinary contractual obligations from provisions indicating control. *See* Restatement (Third) of Agency § 1.01 cmt. f ("The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.").[10] Particularly instructive is the Second Circuit's decision in *Shulman*, where the court considered a contract between an air carrier and an international freight forwarder that purported to establish an agency relationship and required the freight forwarder to collect money owed to the air carrier. *Shulman*, 744 F.2d at 295-96. In holding that there was insufficient control for an agency relationship, the court emphasized the "lack of concern" by the air carrier over the way the freight forwarder "handled the monies it collected." *Id.* at 295-96. The court further noted that the air carrier's

---

[10] New York courts routinely apply the Third Restatement of Agency. *See, e.g.*, *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 468-69 (2010); *B&H Assocs. of N.Y., LLC v. Fairley*, 50 N.Y.S.3d 495, 497 (App. Div. 2017). The Second Circuit has also looked to this specific provision of the Third Restatement in deciding agency issues under Connecticut law. *See Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 278-79 (2d Cir. 2013).

indifference as to the terms by which the freight forwarder extended credit also militated against a finding of direction and control. *Id.* at 296; *see id.* ("Ordinarily, an agent who sells goods or services on behalf of his principal cannot extend credit without the principal's authorization, nor can that agent initiate legal action to collect a debt owed its principal unless authorized to do so.").

Harrah's contracted with Global Payments to authorize and process the transactions that would allow Harrah's patrons to spend funds at the Casino. This entailed Global Payments securing approval from the cardholder's financial institution and receiving funds from that institution to cover the advances paid to the cardholder by Harrah's. The Global Payments MSA afforded Harrah's some rights to give interim instructions to Global Payments. For example, Harrah's had the right to unilaterally modify the processing fees charged for cash advances:

> [Harrah's] may increase the Debit Card Purchase Fees from time to time by delivering at least ten (10) days prior written or verbal notice to [Global Payments.] In addition, [Harrah's] shall have the ability to waive all or any portion of the Debit Card Purchase Fee for an Individual Cardholder from time to time.

Global Payments MSA, Exh. B, Services, Equipment, and Software ¶ 11.B(1); AA0228. In addition, while the agreement specified that "[Global Payments] will supply Cash Advances," Joint Statement ¶ 33; Global Payments MSA, Exh. B, Services, Equipment, and Software ¶ 1; AA0226, it was Harrah's who funded the cash advances to the cardholder at the Casino, Joint Statement ¶ 64, evincing Harrah's substantial involvement in the cash advance process.

On the other hand, the Global Payments MSA did not provide Harrah's with any rights to manage or modify the manner by which Global Payments authorized or processed the cash advances, or the process by which Global Payments communicated with the cardholder's financial institution to secure that institution's approval. This reflects a "lack of concern" by Harrah's over the process of how the money was collected, which the Second Circuit in *Shulman* found significant. *Shulman*, 744 F.2d at 295-96. The agreement also required Harrah's to abide by Global Payments' procedures pertaining to cash advances. *See* Global Payments MSA, Exh. B,

Services, Equipment, and Software ¶¶ 4.1, 5, 8-9; AA0227.  As to Global Payments' processing system utilized by Harrah's employees at the cashier cage, Joint Statement ¶ 64, the contract stated that "[Harrah's] will use the Cage System with due care and in accordance with instructions provided by [Global Payments] and the System's manufacturer(s)."  Global Payments MSA, Exh. B, Services, Equipment, and Software ¶ 2.1; AA0226.  Global Payments, like Harrah's, also retained certain rights of interim control over the undertaking.   Under the contract, Global Payments was permitted to unilaterally deem a cash advance "questionable, fraudulent, not genuine or . . . otherwise unacceptable under the Card Association or Network Organization rules," and thereby require Harrah's to "reimburse [Global Payments] for the full amount of the applicable Cash Advance transaction."  Global Payments MSA, Exh. B, Services, Equipment, and Software ¶ 4.3; AA0227.[11]

The record therefore does not provide a clear answer as to whether Harrah's exercised sufficient control over Global Payments to establish an agency relationship.  Both Harrah's and Global Payments maintained a measure of control over the other.  Generally, where a party has "submitted sufficient proof to raise a question with respect to the nature of the [agency] relationship," this question must be resolved at trial.  *Carrion v. Orbit Messenger, Inc.*, 596 N.Y.S.2d 50, 51 (App. Div. 1993), *aff'd*, 82 N.Y.2d 742 (1993); *see also In re Nigeria Charter Flights Cont. Litig.*, 520 F. Supp. 2d at 461 ("[W]here the circumstances raise the possibility of a principal-agent relationship, and no written authority for the agency is established, questions as to the existence and scope of the agency must be submitted to the jury.") (quoting *Time Warner City Cable v. Adelphi Univ.*, 813 N.Y.S.2d 114, 116 (App. Div. 2006); *LFD Operating, Inc. v. Ames*

---

[11] As noted, Global Payments sent payment to Harrah's on the subsequent federal wire day in the amount of the daily cash advances.  While not entirely clear, the provision at Paragraph 4.3 of the Services, Equipment, and Software section quoted above may have required Harrah's to return that payment if Global Payments deemed the cash advance unacceptable.

*Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600, 618 (Bankr. S.D.N.Y. 2003) ("In New York, the sufficiency of control is a question of fact."), *aff'd*, 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd*, 144 F. App'x 900 (2d Cir. 2005).  Because triable issues of fact exist, the Court vacates the Bankruptcy Court's agency holding.

## C.  This Case is Remanded to the Bankruptcy Court for Determination of Transferee Status

The Bankruptcy Court appeared to rest its determination that Harrah's was an initial transferee on its finding of an agency relationship between Harrah's and Global Payments.  *See* July 24, 2020 Order at 20 ("One who accepts a preference not for his own account but as an agent for a principal is not the person receiving it or to be benefited thereby." (quoting *Carson v. Fed. Reserve Bank of N.Y.*, 254 N.Y. 218, 235 (1930) (internal quotation marks omitted)); *id.* at 21 ("Under the Global MSA and as confirmed by Harrah's Rule 30(b)(6) witness, Global [Payments] acted as Harrah's 'agent' in connection with the cash advance services which included collecting the repayment from the Chase Account for Harrah's.").  The next question then becomes whether, with the agency issue unresolved, a genuine issue of material fact exists as to whether Harrah's or Global Payments was a transferee, initial or subsequent, or a mere conduit of the funds.  If Global Payments was a mere conduit, it may be that Harrah's was the initial transferee, even if Global Payments was not acting as its agent.

While the Bankruptcy Code does not define "transferee" or "initial transferee" for purposes of section 550, "a body of case law has developed that distinguishes 'the initial recipient—that is, the first entity to touch the disputed funds—[from] the initial transferee." *Pergament*, 595 B.R. at 10 (alteration in original) (citing *Finley*, 130 F.3d at 56).  "[T]he law in this circuit is that an initial transferee must exercise dominion over the funds at issue and be able to put them to his own purposes and that a party is *not* an initial transferee if it was a mere conduit of the funds." *Id.* (internal quotation marks and citation omitted); *accord Finley*, 130 F.3d at 57-58; *see Bonded Fin.*

*Servs.*, 838 F.2d at 893 ("[W]e think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes.").  "In its simplest construction, the mere conduit doctrine 'envisions that there are three relevant parties: the transferor, the conduit, and a third party who receives the transferred funds from the conduit." *McCord v. Ally Fin., Inc. (In re USA United Fleet, Inc.)*, 559 B.R. 41, 64 (Bankr. E.D.N.Y. 2016) (citing *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 15 (S.D.N.Y. 2007)).  This theory "is based on the premise that the conduit did not have dominion or control over the transferred property and cannot or should not be deemed a 'transferee.'" *Id.* (citing *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.) ("Allou")*, 379 B.R. 5, 15 n.6 (Bankr. E.D.N.Y. 2007)).  The "mere conduit" is a financial intermediary, "with actual or constructive possession of the asset," whose sole function is to transfer the property to another entity.  *Authentic Fitness Corp. v. Dobbs Temp. Help Servs. Inc. (In re Warnaco Grp., Inc.)*, No. 03 Civ. 4201 (DAB), 2006 WL 278152 at *6 (S.D.N.Y. Feb. 2, 2006); *id.* ("Mere conduits can do no more than transmit a transferor-debtor's funds to a transferee.").

As a preliminary matter, the Court rejects on the undisputed record Harrah's argument that Global Payments and Harrah's were mere conduits because they were transmitting the Debtor's funds to Zambri, who in turn was the initial transferee.  Harrah's Brief at 27-31.  Harrah's argues that "equity supports finding that Global [Payments] and Harrah's were fiduciary intermediaries who merely facilitated Zambri's, as Debtor's principal, withdrawal of cash from [the] Chase [Account]."  *Id.* at 23, 27.  But when adopting the "mere conduit" test discussed above, the Second Circuit rejected an alternate approach of "exercis[ing] . . . equitable powers to excuse innocent and casual 'initial transferees.'"  *Finley*, 130 F.3d at 56-58.  Rather, the relevant inquiry in this Circuit is whether an entity exercised dominion and control over a debtor's funds.  *Id.*; *see Bruno Mach. Corp.*, 435 B.R. at 848 ("The majority of the circuits, including the Second Circuit, apply the

'dominion and control' test."). The money that Zambri received at the Casino came from Harrah's, not from the Debtor's Chase Account. Joint Statement ¶¶ 64, 78. Because Zambri never exercised control or dominion over *the Debtor's* funds, he cannot be the initial transferee.

Nor is the Court persuaded by Harrah's argument that Zambri had "legal control" over the Debtor's funds by initiating the transfers. *See* 6/9/21 Tr. at 6-10; Harrah's Brief at 29-30. The cases relied on by Harrah's involved the principal retaining control over the funds by virtue of first causing the debtor to issue a check to the principal's name and then the principal using that check to pay the principal's already existing debts. *See* Harrah's Brief at 29-30 (citing *Richardson v. United States (In re Anton Noll, Inc.) ("Anton Noll")*, 277 B.R. 875, 880 (B.A.P. 1st Cir. 2002) and *Ragsdale v. South Fulton Mach. Works (In re Whitacre Sunbelt, Inc.)*, 200 B.R. 422, 426 (Bankr. N.D. Ga. 1996)).[12] In those cases, there was a time period where the principal had dominion over the funds before they were transferred to another entity, with the principal being able to "use the money as he pleased, be it to buy 'lottery tickets or invest in uranium stocks.'" *Anton Noll*, 277 B.R. at 881 (quoting *Bonded Fin. Servs.*, 838 F.2d at 894). Here, Global Payments received the Transfers directly from the Debtor, with no check passing through Zambri. Further, the Global Payments' receipt that Zambri obtained at the ATM is not analogous to a check issued by a debtor in its principal's name. It did not grant Zambri rights to use the Debtor's funds as he wished, but was instead issued for the limited purpose of allowing a Harrah's cashier to confirm that Global Payments approved a transaction.[13] Zambri could not, as in the case of a check issued

---

[12] Harrah's also relies on *Hooker Atlanta (7) Corporation v. Hocker (In re Hooker Investments, Inc.) ("Hooker")*, 155 B.R. 332 (Bankr. S.D.N.Y. 1993), *see* Harrah's Brief at 31; 6/9/21 Tr. at 7, which is distinguishable as well. That case involved a debtor transferring funds to an escrow agent's account, with the bankruptcy court finding that the alleged initial transferee had "control" over "the disposition of the escrowed deposit," and was able to disburse the funds "as he wished." *Hooker*, 155 B.R. at 340-41.

[13] Some of the cases cited by Harrah's relied on legal authorities to conclude that the purported initial transferee received cognizable rights in the debtor's funds before they were used to pay off the transferee's debts. *See Anton Noll*, 277 B.R. at 880 (looking to Rhode Island law to

to his name, decide to use that receipt to pay his taxes, rent, or even withdraw cash at a different casino.[14]

Given Global Payments' receipt of the Transfers from the Debtor's Chase Account, Harrah's transferee status may depend on whether Global Payments was, upon receipt of those funds, the initial transferee or a mere conduit. This determination, in turn, may largely depend on the unresolved agency issue and on the degree of discretion that Global Payments retained upon receiving the funds from Chase. Whether Global Payments retained dominion or control over those funds, and whether Global Payments in fact then transferred the Debtor's funds to Harrah's (as opposed to transferring Global Payments' own funds to Harrah's), could be determinative as to whether Harrah's was the initial transferee or a subsequent transferee. If Harrah's is a subsequent transferee, as noted above, Harrah's would have at its disposal a more favorable defense to liability in the adversary proceeding. *See* 11 U.S.C. § 550(b)(1). Accordingly, the Court remands to the Bankruptcy Court to consider these issues in the first instance after

---

determine the principal's legal rights upon receipt of a check payable to him); *Hooker*, 155 B.R. at 339 (citing to cases and a treatise to find that money deposited in an escrow account created an equitable interest in the funds in favor of the grantee). Harrah's fails to marshal any support for the proposition that a receipt that Zambri received from an Ultron ATM granted him any similar rights. To the contrary, the record shows that the receipt did not entitle Zambri to Harrah's funds— let alone the Debtor's funds—until the Casino cashier confirmed his identity and checked that the transaction was approved by another system located at the cashier cage.

[14] To the extent Harrah's suggests that Zambri's authority to effectuate a transfer of the Debtor's funds is sufficient to satisfy the dominion and control test, such an approach to identifying an initial transferee has been rejected in this Circuit and elsewhere. *See Tese-Milner v. Brune (In re Red Dot Scenic, Inc.)*, 293 B.R. 116, 121 (S.D.N.Y. 2003) ("The structure and purpose of section 550(a)(1) confirm that a principal does not become an initial transferee simply by using his control over corporate assets to effect a fraudulent transfer."), *aff'd*, 351 F.3d 57 (2d Cir. 2003); *id.* at 124 (finding a third party who retained physical control over the debtor's funds to be the initial transferee notwithstanding a debtor's principal causing those transfers to be made for the principal's benefit); *Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996) ("The extent to which a principal has de facto control over the debtor before the funds are transferred from the debtor, and the extent to which the principal uses this control for his or her own benefit in causing the debtor to make a transfer, are not relevant considerations in determining the initial transferee under § 550.").

conducting any further fact-finding the court deems appropriate. *See Super Nova 330 LLC v. Gazes*, 693 F.3d 138, 144 (2d Cir. 2012) ("[B]ecause of the Bankruptcy Court's specialized knowledge, we deem it wise to permit the parties to brief and argue the issue before that court in the first instance.").

Further, because this Court is unable to resolve the transferee question as matter of law, it is also premature to determine on appeal two other issues raised by Harrah's: (1) if Harrah's is a subsequent transferee, whether Harrah's established the affirmative defense under section 550(c) for taking the funds for value, in good faith, and without knowledge of the voidability, and (2) whether the Trustee met section 550's requirement "of tracing [the] funds it claims to be property of the estate," *IBT Int'l, Inc. v. Northern (In re Int'l Admin Servs., Inc.)*, 408 F.3d 689, 708 (11th Cir. 2005); *accord Allou*, 379 B.R. at 30.  These issues too are best decided by the Bankruptcy Court in the first instance, to the extent they remain relevant following any transferee or conduit determination.

## IV.  Conclusion

Accordingly, the Bankruptcy Court's August 6, 2020 Judgment is vacated and the case is remanded to the Bankruptcy Court for further proceedings consistent with this Opinion and Order. The Bankruptcy Court retains discretion on whether to allow the parties to conduct further discovery, entertain renewed summary judgment motions, or proceed to trial on the current record.

The Clerk of Court is respectfully directed to close this matter.

Dated: July 19, 2021
      New York, New York
                                  JOHN P. CRONAN
                            United States District Judge